

**SIGNED this 07 day of November, 2005.**

_____
**FRANK R. MONROE**
**UNITED STATES BANKRUPTCY JUDGE**

_____

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CASE NO. 03-15244-FM |
| PAMELA KAYE JAMISON | ) | (Chapter 7) |
| _____DEBTOR_____ | ) | |
| UMBRELLA BANK, FSB, | ) | |
| | ) | |
| Plaintiff | ) | |
| vs. | ) | ADVERSARY NO. 04-1055-FM |
| | ) | |
| PAMELA KAYE JAMISON, | ) | |
| JAMES R. KERSH,  and | ) | |
| MARSHA G. MILLIGAN, TRUSTEE | ) | |
| Defendants | ) | |
| _____ | ) | |
| MARSHA G. MILLIGAN, TRUSTEE | ) | |
| RANDOLPH N. OSHEROW, TRUSTEE | ) | |
| PAMELA KAYE JAMISON, and | ) | |
| JAMES R. KERSH, | ) | |
| Counterclaimants | ) | |
| v. | ) | |
| UMBRELLA BANK, FSB, | ) | |
| Counterdefendant | ) | |

<u>MEMORANDUM OPINION</u>

The Court held a trial of the above-referenced and numbered adversary proceeding on March 30, 2005.  This trial arises out of a complaint to determine the validity and extent of a lien and also seeks a declaratory judgment that such lien is invalid pursuant to 28 U.S.C. §2201 and Federal Rule of Bankruptcy Procedure 7001(2) and (9).  At the conclusion of the proceedings, the Court took the matter under advisement.  This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §1334(a) and (b), 28 U.S.C.§157 (a) and (b)(1), 28 U.S.C. §151 and the Standing Order of Reference of all bankruptcy related matters by the United States District Court, Western District of Texas. Venue lies in this Court pursuant to 28 U.S.C. §1409(a), in that the subject matter is a core proceeding under 28 U.S.C. §157(b)(2).  This  Memorandum Opinion is being issued as written Findings of Fact and Conclusions of Law as required by Bankruptcy Rule 7052.

<u>Findings of Fact</u>

This Adversary Proceeding involves a home equity loan made by  Umbrella Bank, F.S.B. (formerly Argo Federal Savings Bank and now known as Flower Bank, F.S.B.)(mainly referred to herein as "Bank") to Pamela Kaye Jamison ("Debtor") and James R. Kersh (herein collectively referred to as the "Borrowers"), on or about April 17, 2000 in the amount of $525,000 (the "Home Equity Loan"). The property at issue is located at 6005 Lost Trail Cove, Austin, Travis County, Texas 78730 and was the homestead of Debtor and Mr. Kersh (the "Homestead").  The Home Equity Loan account number with the Bank was 1115005872.  Defendants' Exhibit 21, 9th Page.

Prior to making the Home Equity Loan at issue here, the Bank had extended an earlier home equity revolving line of credit to Debtor and Mr. Kersh, dated December 26, 1998, in the original principal amount of $125,000.00 (the "HELOC").  At the time the Bank extended the HELOC to Debtor and Mr. Kersh, the Texas Constitution did not provide for creation of a lawful, valid and

2

enforceable lien against a Texas homestead in connection with such a revolving line of credit. The HELOC account number was 285004736. Defendants' Exhibit 21, 4th Page

At that time the Borrowers, along with several other individuals, operated Texas Financial Corporation ("TFC), a wholesale mortgage business. The Borrowers were shareholders, directors and also officers of TFC. The Bank extended to TFC a warehouse line of credit which allowed TFC to acquire and warehouse its mortgage portfolio for future securitizations into the secondary market. The line of credit agreement required TFC to conform to certain requirements including timely sale of its mortgages or risk additional bank charges. This banking relationship also required TFC to maintain an operating account with the Bank. The TFC operating account number was 212061601. Defendants' Exhibit 19. The Bank had a deposit account at this time where all warehouse line of credit payments including payments from TFC were deposited prior to such funds being applied to the correct accounts. Defendants' Exhibit 21, 14th Page. This was the Bank's ECN Loans in Transit Account and the account number was 137060077. Defendants' Exhibit 21, 14th Page. Mr. Yedinek, who was at the time the Bank's CEO, explained that ECN was a subsidiary of the Bank that was responsible for all the accounting for the warehouse lines of credit.

Early in 2000 the Bank was audited as it is a publicly held lending institution. According to Mr. Yedinek, the auditors expressed concern with TFC's warehouse line of credit and TFC's inability to timely sell its loans into the secondary market. TFC was often past due or in an "overdraft" position with respect to the charges levied by the Bank against it. See, TFC Operating Account–Defendants' Exhibit 19. It was clear from Mr. Yedinek's testimony that he discussed the Bank's concerns with Mr. Kersh regarding these overdrafts and indicated his need to initiate collection efforts if TFC could not timely repay its obligations to the Bank. Likewise, it is apparent

3

that Mr. Rosynek, the actual loan officer overseeing the Home Equity Loan, also discussed this TFC "overdraft" issue with Mr. Kersh. Counterdefendants' Exhibit 2–Transcript of Taped Phone Calls of April 20, 2000 and April 21, 2000.

The Borrowers claim that as a condition to making this Home Equity Loan, the Bank required them to use a portion of the proceeds to repay the earlier HELOC loan and to pay certain indebtedness owed by TFC to the Bank. The final HUD-1 Settlement Statement pertaining to the Home Equity Loan reflects a payment to the Bank of $346,014.74 out of the proceeds of the Home Equity Loan with $217,080.92 disbursed to Borrowers. The title company wired the payment to the Bank pursuant to Mr. Rosynek's written directions. Of that amount $226,089.74 was applied by the Bank to repay the HELOC loan. Defendants' Exhibit 21, 4th Page. To date, the Bank has been unable to account for the application of the remaining $119,925.00 paid to it from the Home Equity Loan proceeds although the Bank contends that $68,000.00 of the funds were applied at the request of Mr. Kersh to overdrafts of TFC that occurred after the Home Equity Loan closed. The $119,925.00 does appear in the ECN Loans in Transit Account # 137060077 as being deposited April 24, 2000 and described as "TFC Kersh JE 65577". Defendants' Exhibit 21, 14th Page. Likewise, the $68,000.00 overdraft payment is reflected in three Bank entries– (1) in the ECN Loans in Transit Account #137060077 on April 26, 2000 and described as "TFC JE 65629"; (2) in the TFC Operating Account #212061601 as a deposit on April 27, 2000 in the April statement stating "Dep Wire for TFC to cover OD from 4-26 JE 523; and (3) in the Bank's Item Entry System two times reflecting first a deposit wire for TFC in ECN Loans in Transit Account #137060077 to cover "OD" from 4/26 and then as a deposit wire for TFC to TFC Operating Account #212061601 to cover "OD" from 4/26.

4

Payments were made, by or on behalf of the Borrowers, to the Bank on the Home Equity Loan in the total amount of $95,227.20.  See. Counter Defendants Exhibit 1.  The Bank claims that only $25,393.92 was made directly by the Borrowers as this was the only check presented as evidence of payment.  However, the Bank's journal vouchers reflect all of the other payments listed in Counter Defendant's Exhibit 1 as being made by the Borrowers with respect to this loan. Defendants' Exhibit 21, 8th -11th Page.

On June 27, 2001 the Bank sent the Borrowers its Notice of Acceleration of the Home Equity Loan and demanded that the Borrowers promptly pay the Bank the sum of $595,668.87 that was then due.  Payments totaling $63,484.80 were received by the Bank prior to the Bank's Notice of Acceleration.   Following the Notice, the Borrowers made additional payments totaling $31,742.40.  On December 14, 2001 counsel for the Borrowers sent the Bank a notice letter informing the Bank that the Home Equity Loan was unlawful, the lien against the Homestead invalid and that the Bank had violated the usury laws of the State of Texas in connection with the extension of credit.

On April 11, 2002 the Bank filed an "Application for Foreclosure" in Texas state court. Prior to being served with the Application, the Borrowers separately filed their "Original Petition for Declaratory Judgment, Statutory Penalty and Damages" on April 26, 2002.  Both matters were filed in the District Court of Travis County, Texas and, by an Agreed Order, the two (2) actions were thereafter consolidated in state court.

While the consolidated state court matter was pending (i) Mr. Kersh filed a bankruptcy petition on June 24, 2002 in Case No. 02-12401 and Mr. Osherow was appointed Chapter 7 Trustee of his bankruptcy estate, and (ii) thereafter, Ms. Jamison filed a bankruptcy petition on October 16,

2003 and Ms. Milligan was appointed Chapter 7 Trustee of her bankruptcy estate.  Ms. Milligan subsequently removed this matter to this Court.  The Homestead was sold pursuant to an earlier Order of this Court and the proceeds of sale are being retained by Ms. Milligan pending further order of this Court.

The Borrowers' legal counsel, James D. Jameson, was employed as Special Counsel to Mr. Osherow, Trustee and Ms. Milligan Trustee, by Orders of this Court dated November 14, 2002 and November 22, 2004, respectively.  This Court ordered that Special Counsel would be employed and compensated on the basis of a contingent fee of either (a) 33 1/3 % of any recovery, plus expenses, in the event this matter does not go to trial or (b) 40% of any funds recovered, plus expenses, if the matter is tried.

All parties stipulated in their Pretrial Orders to the reasonableness and necessity of attorney's fees as follows:

(1) Preparation and trial: $35,000.00

(2) Appeal to the United States District Court: $10,000.00

(3) Appeal to the United States Court of Appeals: $5,000.00

(4) Making or responding to a petition for certiorari: $2,500.00

(5) Briefing on the merits and argument before the United States Supreme Court
$5,000.00.

The parties also agreed that the Bank had incurred recoverable costs and expenses totaling $3,250.00 and the Borrowers incurred such costs and expenses of $1,625.00.

Cross Motions for Summary Judgment were filed with respect to the validity of the  Home Equity Loan and heard on February 2, 2005.   At the hearing the Court determined 1)  that as a

6

condition to making the April 17, 2000 Home Equity Loan, the Bank required the Borrowers to pay off the earlier December 26, 1998 HELOC owed to the Bank; 2) that the December 26, 1998 HELOC did not comply with the provisions of the Texas Constitution at the time it was made[1] and the lien granted under the HELOC loan was invalid as of the date of the April 17, 2000 Home Equity Loan; 3) there was no evidence that either Borrower had made an effective waiver of their rights under the Texas Constitution and 4) there was no genuine issue of material fact remaining for trial on those issues. The Court, then, on March 29, 2005 entered its order granting Borrowers' Motion for Summary Judgment ordering that (a) the purported lien on the Homestead securing the Home Equity Loan was invalid, unlawful and unenforceable, (b) the Promissory Note dated April 17, 2000 signed by the Borrowers in connection with the Home Equity Loan was invalid, unlawful and unenforceable against the Borrowers; (c) the Bank must forfeit all principal and interest of the Home Equity Loan in accordance with the terms of Art. 16, Sec. 50(a)(6)(Q)(x) of the Texas Constitution; and (d) the Borrowers are entitled to retain the proceeds from the sale of the Homestead.

Several issues remained for trial and are addressed herein.

## Legal Issues

1) Whether the Bank further violated the provisions of the Texas Constitution by requiring the Borrowers repay certain purported third party debt of TFC (owed to the Bank) with the proceeds of the Home Equity Loan?

2) What amounts are to be included in calculation of the "principal and interest" to be

---

[1]The HELOC was not secured by a valid lien on the Homestead due to the fact that home equity lines of credit were not lawful in Texas until September 13, 2003 (almost five (5) years after the closing of the Bank extension with respect to the HELOC).

forfeited by the Bank as a result of its violation(s) of the provisions of the Texas Constitution pertaining to home equity loans?

3) Whether the Bank violated the usury laws contained in the Texas Finance Code in connection with the Home Equity Loan and, if so whether the Bank is liable to the Borrowers for statutory penalties pursuant to Tex. Fin. Code §§ 303.009, 305.001, 305.002 and 305.005?

4) Whether the Borrowers are entitled to reasonable and necessary attorney fees and costs pursuant to (a) Section 37.009 of the Texas Civil Practice and Remedies Code; or (b) the Texas Finance Code?

1) <u>Further Violation of the Texas Constitution</u>?

It has been determined that the Bank required the Borrowers to "repay" the purported HELOC obligation with proceeds of the subject Home Equity Loan. What was tried is whether the Bank required the Borrowers to also repay certain debt of TFC out of the Home Equity Loan proceeds. The Bank maintains that it did not make it a condition to the extension of the Home Equity Loan that certain TFC debt be repaid.

This initially appears to be the classic "he said, she said" trial. James Kersh testified that John Yedinak, one of the Bank's officers, told him over the phone that the Bank would only make the loan if Mr. Kersh paid off TFC's debt. John Yedinak, of course, denied that paying off third party debt was a condition of making the loan and testified that he never even spoke to Kersh about the loan. Mr. Kersh also testified that Ralph Rosynek, the actual loan officer for the Home Equity Loan, told him that the Bank would only make the loan if Mr. Kersh paid off some of the TFC debt. Mr. Rosynek however, denied this. See Rosynek Deposition–page 20, lines 5-9, page 22, lines 14-21 and page 27, lines 14-22 and Affidavit-Exhibit to Deposition. Ms. Jamison testified that in one

8

instance Mr. Yedinak put pressure on her about paying down third party debt, but agreed on cross that in her deposition she testified that she had never spoken to anyone at the Bank about anything related to the Home Equity Loan.

From testimony it appears that Mr. Kersh was willing to pay some additional loan amount to the Bank for actual application on the Home Equity Loan. In fact, Mr Kersh, in a telephone conversation that Mr. Kersh taped with Mr. Rosynek, indicates his willingness to do just that. (Counter Defendant's Exhibit 2; Transcript of the taped conversations: April 6, 2000, 6:00 p.m., page 2 paragraph 6: "Anyway if you want to do it out at a 150 additional where the whole deal is another 400 what we would do is kick that back on the note once you go ahead and pull it out to take care of your stuff." This testimony also shows that Mr. Kersh also knew a portion of the loan was to "take care" of TFC payments owed to the Bank. But, the telephone transcript does not independently show that such payments were required/or were not required as a condition of the Bank's to making the Home Equity Loan.

The Bank did produce evidence that the $119,925.00 proceeds from the Home Equity Loan was transferred into the Bank's ECN Loans in Transit Account on 4/24/2000. Defendants' Exhibit 21, 14th page–ECN Loans in Transit Reconciliation dated 4/30/00. Mr. Yedinek explained that ECN was a subsidiary of the Bank that handled all the accounting for the warehouse lines of credit. The Bank claims that $68,000.00 of the $119,925.00 was then used to pay overdrafts in the TFC operating account that were incurred after the closing on the loan. As such, the Bank argued that such payments could not have been required as a condition of making the Home Equity Loan. The TFC operating account did experience an overdraft position on April 27, 2000 around $67,000.00. Defendants' Exhibit 19, TFC Operating Account–April statement. The $68,000.00 was transferred

(the documents say wired) into the TFC operating account to cover the overdrafts. Defendants' Exhibit 21, last page and Defendants Exhibit 19-TFC Operating Account–April statement. However, if a portion of the $119,925.00 was used to pay the $68,000.00 to correct the post-closing overdraft position in the TFC account, the Court does not understand why the ECN Loans in Transit Reconciliation reflects both the $119,925.00 on 4/24/00 and the $68,000.00 on 4/26/00 as separate loans in transit. Defendants' Exhibit 21, 14th Page. The fact is that there are no Bank records that show where or from whom the $68,000.00 came from and the Bank's assertion that the $68,000.00 came from the $119,925.00 is rebutted by its own evidence; i.e. the $68,000.00 is reflected as a separate loan in transit from the $119,925.00. Further, there are no Bank records which show how the Bank applied the $119,925.00.

The Bank simply argues that there is no possible way that any third party debts were required to be paid as part of the loan closing as none existed at the time. This is not exactly true.

Although the Bank acknowledges receipt of the additional $119,925.00, the Bank is unable or unwilling to show where any of that $119,925.00 went once it was received by the Bank. Despite numerous requests by the Borrowers and their counsel before and during the course of this adversary proceeding, the Bank has refused to produce any kind of accounting or bank records pertaining to the application of this $119,925.00. It only claims [without documentary support] that a portion was used to pay the $68,000.00 overdraft. This is no more than an undocumented assertion.

Most telling of all is that beginning March 20, 2000 the Bank made advances to itself in the aggregate amount in excess of $180,000 pursuant to an alleged home equity loan for purposes of

"balancing" the so-called TFC operating account.[2]  Defendants' Exhibit 19 (TFC Operating

Accounts 03/01/00 thru 03/31/00 and 04/01/00 thru 4/29/00 Statements).  Such advances were used

to offset TFC overdrafts of which all but one occurred prior to the closing of the Home Equity Loan

at issue here.  The Bank produced no evidence that this "home equity loan" with account number

285005256 actually existed.  The Court concludes that this was a "dummy loan" where advances

were booked in anticipation of the actual Home Equity Loan closing in April.

Plus, pertinent portions of the transcript of taped phone calls between Messrs. Kersh and

Rosynek show that Mr. Rosynek was looking to the Home Equity Loan proceeds as a source of

funds to repay these prior overdrafts and other obligations of TFC that the Bank was charging due

to TFC's defaults under the warehouse line of credit.   The pertinent conversation follows:

April 20, 2000

RR–"I'll send you the amount that the title company has got to send a reverse wire back to
your TFC operating account."
........

RR. "And from there they will pull and pay off the old one [HELOC] plus pay on the
overdraft and the excess will be left in your operating."

JB–"okay well how much do we got on the overdraft?"

RR–"um, I think there is going to be about 20,000 left over if nothing else the last time I
looked at it was about 178 or 179 with a credit of 78,000 approximately."[3]

JB-okay

---

[2]Advances were $108,093.48 on 3/20/00, $31,950 on 3/31/0, $4,209.75 on 3/22/00, $3,987.39 on 3/23/00,
$275.61 on 3/24/00, $3,185.12 on 3/27/00, $400.00 on 3/28/00, $355.00 on 3/30/00, $4,162.44 on 3/31/00, $645.00
on 4/3/00, $18,869.15 on 4/7/00, $195.00 on 4/10/00 with the final advance being for $5,248.77 on 4/18/00–all
entries state: "Advance from Home Equity Loan 2850052567". This Loan No. is different from the HELOC loan
number and from the Home Equity Loan at issue in this case.

[3]This "178 or 179" is quite close to the $180,000 in advances.

11

RR–"so if there has been no other ones that have hit now when that overdraft clears again when you saw those loans off, you are going to have that cash back again."

. . .

RR–"yeah, what I will do is give you wiring instructions and you just have the title company will know that there is 595 coming in and then you have them return a wire back out."

JB-"for the difference which would be 563,095.66"

RR–"right"

.... ..

RR–"okay, yeah so out of the 560 whatever is left and then about 225 [HELOC] plus 110 maybe 112, is going to come back this way.  Then the rest will be a check cut to you."[4]

April 21, 2000

JB, "I was just touching base with you. Have you gotten it figured out how we are going to do this."

RR–"I basically called Connie [title company employee].  We wired out the 595 and what I did is I told her to send back $346,014.74. Which is the note plus the interest on your present HELOC plus a hundred twenty thousand.  So that leaves you with what?  248,985.26 and then whatever checks and payments are coming out of that."

Therefore, Mr. Rosynek's sworn testimony that the topic of paying off TFC debt with Home Equity Loan proceeds "never came up" is patently not believable.  Further, it is clear that Mr. Rosynek expressly instructed the title company at closing to wire the $346,014.74 to the Bank from the Home Equity Loan proceeds with such instruction referencing this wire as TFC/Kersh. Defendants' Exhibit 11.  It is also interesting to note that Mr. Rosynek, in his deposition, could not recall if TFC was past due on any of its obligations to the Bank nor could he recall the specifics surrounding the TFC/Kersh Home Equity Loan closing or how the $346,014.74 was to break down even though he was in charge of the wiring instructions and his telephone conversations with Mr. Kersh indicate otherwise.

---

[4]The actual amount was $119,925.

Likewise, the Bank's assertion that the subject of the Home Equity Loan never came up in Mr. Yedinak's conversations with Mr. Kersh is also untenable.  Mr. Yedinak could not recall, at trial, whether he  discussed with Mr. Kersh using certain of the equity in the subject Homestead to repay obligations of TFC owing to the Bank.  Mr. Yedinak did, however, as a matter of course, make collection calls to delinquent credits and closely monitored the TFC credit due to the account's deficits and defaults that had been earmarked by the Bank's auditors.   Mr. Kersh's testimony that the Bank, in the person of Mr. Yedinak, made it a condition of the extension of the Home Equity Loan that certain proceeds of such loan be used to repay TFC debt is entirely consistent with the course of dealing between the parties and the situation as it then existed.

Additional evidence controverting the Bank's position is the fact that the Bank's Texas counsel was, apparently, never made aware that the Bank was to be paid any funds from the proceeds of the Home Equity Loan with respect to TFC debt.   The closing instructions sent to the title company by the Bank's counsel and the closing statement signed by the Borrowers at closing does not disclose that $119,925.00 was being sent to the Bank for credit to anything and not the least TFC.  Defendants' Exhibit 7 and 8.  That amount is merely combined with the amount wired to the Bank to repay the HELOC loan pursuant to Mr. Rosynek's instructions.  This evidence indicates that these funds in excess of what was required to pay the HELOC loan were to be applied to TFC debt [the wiring instructions to the title company from Mr. Rosynek referencing the entire $346,014.74 as TFC/Kersh].

Portions of the taped phone conversations entered into evidence by the Bank make it clear that the Bank, subsequent to the April 17, 2000 closing, required that the subject $119,925.00 be wired to it (to be applied against the pre-closing "overdraft amount") for the credit of TFC.  Mr.

Rosynek's Memorandum to the title company, dated April 21, 2000 is consistent with this requirement. Defendant's Exhibit 9. The motivation for the Bank's requirement that certain of the proceeds of the Home Equity Loan be sent to it to be applied against TFC debt, as conditions to the loan itself being made and the funding of the loan, is obvious from the fact that the Bank had booked over $180,000 in advances against the then fictitious home equity loan (prior to expiration of the rescission period on April 21, 2000 and the Bank was very concerned with ongoing problems with the TFC warehouse line of credit.

The evidence and testimony presented coupled with the fact that the Bank could not provide any relevant documentation evidencing the application of the $119,925.00 to any particular debts leads this Court to find that the Bank required the Borrowers to pay off third party debt in violation of the Constitution.

2)  <u>Principal and Interest to be Forfeited</u>

The Texas Constitution states that a "lender or any holder of the note for the extension of credit shall forfeit all principal and interest of the extension of credit if the lender or holder fails to comply with the lender's or holder's obligations under the extension of credit within a reasonable time after the lender or holder is notified by the borrower of the lender's failure to comply." Tex. Const. art. XVI, §50(a)(6)(Q)(x). This section goes on to state that "[n]o mortgage, trust deed, or other lien on the homestead shall ever be valid unless it secures a debt described by that section." Tex. Const. art. XVI, §50(c). As the extension of credit is in violation of §50, it is not valid. Here, the Bank did not avail itself of §50(a)(6)(Q)(x)'s cure provision. Therefore, the Bank is required to forfeit all principal and interest of the extension of credit. No distinction is made between principal and interest already paid, and that yet to be paid. Therefore, the Bank forfeits all principal

14

and interest, whether paid or unpaid.   The Bank argues that the only evidence of payment by the Borrowers is one check in the amount of $25,292.92.   However, the Bank's own journal entries reflect the additional loan payments and no other controverting evidence was introduced.  The Bank must forfeit the sum of $95,227.20 in payments made to it by or on behalf of Ms. Jamison and Mr. Kersh in connection with the Home Equity Loan. See Counter Defendant's Exhibit 1.  Additionally, all unpaid principal and interest must be forfeited.

Borrowers also claim that the Bank should be required to disgorge the amounts of the Home Equity Loan that were improperly used by the Bank to pay the HELOC since it was an extension of credit made in contravention of the Texas Constitution.  As such, the Borrowers want a judgment against the Bank  for  $226,089.74 –the amount used to pay off the prior invalid HELOC loan.   In addition, Borrowers want a judgment for $119,925.00 –the amount  retained by the Bank for the TFC debt.

With regard to paying off the HELOC loan, the Borrowers at that time were liable to the Bank on the HELOC loan and that liability was extinguished when paid out of the new Home Equity Loan.  Even though the Court has determined the HELOC loan to be in violation of the Texas Constitution and invalid as a part of its determination that the Home Equity Loan that is the subject of this lawsuit is invalid, Borrowers have not sued for any direct relief under the HELOC loan.  The subject of the lawsuit is only the later Home Equity Loan.  Also, the principal does not get forfeited twice–only once.  The fact that part of the principal of the Home Equity Loan was used to pay the HELOC loan does not mean the HELOC loan principal is forfeited as well.  That would be a double recovery; and, as noted above the Borrowers have not sued for direct relief from the HELOC loan. The Court reaches the same conclusion with respect to the $119,925.00.  All unpaid principal has

already been forfeited under the Home Equity Loan.  It cannot be both forfeited and recovered.  The

recovery is limited to what the Borrowers paid on the loan.  Forfeiture is to what remained owing.

3)  Usury

With certain limited exceptions not relevant here, the maximum lawful rate of interest on a

Texas home equity loan is 18%.  See. Tex. Fin. Code §§303.009 and 342.301 and 7 TAC §153.16.

Chapter 305 of the Texas Finance Code provides for civil penalties applicable to lenders charging

Texas borrowers with usurious interest and reads, in pertinent part, as follows:

§305.001 "A creditor who . . .charges. . .interest that is greater than the amount authorized by this
subtitle [i.e., 18%] is liable to the obligor for an amount that is equal to . . .three times the amount
of interest computed by subtracting the amount of interest allowed by law from the total amount of
interest charged. . . ."

§305.002 "In addition to the amount determined under section 305.001, a creditor who charges and
receives interest that is greater than twice the amount authorized by this subtitle [i.e. 36%] is liable
to the obligor for : (1) the principal amount on which the interest is charged and received; and (2)
the interest and all other amounts charged and received."

Tex. Fin. Code Ann. (West Supp. 2004).

Borrowers claim in their Supplement to Post Trial Brief that the true amount of principal

loaned to the Borrowers should be calculated by subtracting the $119,925.00 retained by the Bank

for the TFC debt as the Borrowers did not have actual use of these funds as well as by subtracting

the amount used to pay off the HELOC.  See, *First State Bank of Bedford v. Miller,* 563 S.W. 2d 572

(Tex. 1978).  That case involved a $70,000.00 note,  where only $56,000.00 was actually advanced

to the borrower.  The lender retained $14,000.00 to pay interest payments that were to come due on

the loan in the future.   Since the test for usury is applied to the net amount of money that the

borrower had the use, detention or forbearance of and since the borrower had use of only $56,000.00

of the stated loan, that amount was considered as the 'true' principal.

16

The Court does not believe *First State Bank* applies to the extent funds are used to pay off prior loans between the same parties. Otherwise, any time an existing secured loan is paid at closing of a new loan, the lender would be subject to usury violations. This makes no sense.

If the Home Equity loan is usurious, it is because the Bank required the Borrowers to use $119,925.00 of the loan proceeds to repay to the Bank certain obligations owed it by TFC as a condition of making the loan. That requirement meant that the Borrowers did not have use of those funds. Therefore, the $119,925.00 taken by the Bank must be viewed as "interest". *Alamo Lumber Co. v. Gold,* 661 S.W.2d 926, 927-28 (Tex. 1983). As the Texas Supreme Court has clearly stated, "[a] lender's requirement that a borrower assume a third party's debt to the lender constitutes interest on the loan to the borrower." *First USA Management, Inc. v. Esmond,* 960 S.W.2d 625, 627 (Tex. 1997). Accord, *Lentino v. Cullen Center Bank and Trust,* 919 S.W.2d 743, 746 (Tex. App.–Houston [14th Dist.] 1996, writ denied)–"When a lender requires, as a condition to making a loan, that a borrower assume a third party's debt, such debt must be included in the interest computation to determine usury." A requirement that a borrower pay a third party's debt to the lender is the same thing and it violates the statute.

Applying the *Alamo Lumber* doctrine, $475,075.00 is the true principal amount of the Home Equity Loan ($595,000.00 less $119,925.00 equals $475,075.00). On June 27, 2001 the Bank demanded (i.e. "charged") Ms. Jamison and Mr. Kersh pay $595,668.87 by way of its Notice of Acceleration. The period from April 17, 2000 to June 27, 2001 was comprised of 436 days.

For interest rate calculations to determine the issue of usury, the interest charged is only "spread" over the term from loan inception to acceleration. *Armstrong v. Steppes Apts.,* 57 S.W.3d 37, 48 (Tex. App.–Ft. Worth 2001, pet. denied). The maximum lawful interest (18%) computed

over 436 days on a home equity loan balance of $475,075.00=$102,147.63.  This is the absolute maximum amount of lawful interest that the Bank could have charged.  Here, however, the Borrowers made payments of interest in an amount of not less than $63,484.80 after the April 17, 2000 closing and prior to the Bank's acceleration of the loan on June 27, 2001 in addition to what the Bank "charged" on June 27, 2001.

The actual usury calculations are as follows:

1. Note Amount   $ 595,000.00
   *Alamo Lumber* Interest   - 119,925.00
   True Principal Amount   475,075.00

2. Maximum Allowable   $ 102,147.63
   Interest on True Principal
   Amount at 18% for 436 days
   ($475,075 x.18)/365 x 436)

3. Bank's actual interest charged   $ 595,668.87
   as of 6/27/2001   - 475,075.00
     120,593.87

4. Bank's actual interest received   $ 63,484.80

5. Usurious interest amount   $ 119,925.00
     120,593.87
     + 63,484.80
     304,003.67
     - 102,147.63
     201,856.04

6. Statutory Damages   $ 201,856.04
   Tex. Fin. Code §305.001(a)   x          3
     605,568.12

Furthermore, by way of the June 27, 2001 Notice of Acceleration, the Bank charged the

Borrowers in excess of twice the lawful interest (36%)(i.e. $102,147.63 x 2 equals $204,295.26) computed over 436 days on a loan balance of $475,075.00.  The total amount of usurious interest charged and received by the Bank was actually $304,003.67 .

   The Bank's liability for an additional penalty under Tex. Fin. Code Sec. 305.002 (a) is as follows:

| | | |
|---|---|---|
| 1. | Penalty for charging twice the lawful interest under Tex. Fin. Code §305.002(a) | $  475,075.00 |
| | | +304,003.67 |
| | | 779,078.67[5] |

The total amount owed by the Bank to Borrowers pursuant to the Texas Finance Code is:

| | |
|---|---|
| Tex. Fin. Code §305.001(a) Statutory Damage | $  605,568.12 |
| Tex Fin. Code  §305.002(a) Penalty | +  779,078.67 |
| | $1,384,646.79 |

4)   Attorney Fees

   Borrowers request that reasonable attorney fees be awarded under the Texas Declaratory Judgment Act pursuant to §37.009 of the Texas Civil Practice and Remedies Code as the Bank violated certain provisions of the Texas Constitution as well as that such fees be awarded under the Texas usury laws pursuant to §305.005 of the Texas Finance Code in connection with the Bank's usury violations.

   Because this judicial proceeding is now in Bankruptcy Court and is brought under 28 U.S.C. §1334, federal rules and statutes apply.  Borrowers therefore correctly request declaratory relief

---

[5]Previous versions of the Texas Finance Code pertaining to the maximum usury penalty provided that the lender "shall forfeit principal and interest" where twice the rate of lawful interest was charged.   At its last redrafting, however, the legislature expressly provided for penalty liability in the amount of the principal upon which the unlawful interest was charged, together with the amount of interest and all amounts charged and received.  See Tex. Fin. Code Sec. 305.002(a)(1) and (2) and *Strasburger Enterprises, Inc. v. TDGT Ltd.. Partnership,* 110 S.W.3d 566, 578 (Tex. App.–Austin 2003).

pursuant to 28 U.S.C. §2201 and Federal Bankruptcy Rule 7001(9). *See, Dinkel Enterprises, Inc., v. Colvin (In re Bailey Pontiac),* 139 B.R. 629 (Bankr. N.D. Ft. Worth, 1991)[6]. Federal Rule of Bankruptcy Procedure 7001(9) requires an adversary proceeding for a party who seeks declaratory judgment relating to the types of relief covered by Federal Rule of Bankruptcy Procedure 7001(1)-(8). Federal Rule of Bankruptcy Procedure 7001(2) covers a proceeding to determine the validity, priority or extent of a lien, which is precisely the issue in the case at bar.

The Borrowers also request attorney fees be awarded, however, they request that these fees be awarded not under the Federal Declaratory Judgment Act but under the Texas Declaratory Judgment Act pursuant to Section 37.009 of the Texas Civil Practices and Remedies Code. The Texas Declaratory Judgment Act provides that a court may award reasonable and necessary attorney's fees as are equitable and just. Tex. Civ. Prac. & Rem. Code Ann. §37.009 (West 2005); *Chambers v. Ochiltree,* 2005 WL 2814288 (Tex. App.-Austin 2004). Attorney fee awards under the Declaratory Judgment Act are left to the discretion of the trial court, subject to the requirement that any fees awarded be reasonable and necessary which is a question of law. *Boquest v. Herring,* 972 S.W.2d 19, 21 (Tex. 1998).

It is unclear whether this Court actually has authority to award such fees under the Texas Declaratory Judgment Act although this issue was not raised by either party other than the Bank citing to a home equity case in a United States District Court where attorney's fees were not allowed in a declaratory judgment action there. *Thomison v. Long Beach Mortgage Compnay,* 176 F.Supp. 2d 714 (U.S.D.C. W.D. Tex. 2001). The *Thomison* court by Order denied the Plaintiff's Motion for

---

[6]Defendants originally brought suit in state court under the Texas Declaratory Judgment Act. The suit was then removed to Bankruptcy Court by Ms. Jamison's Chapter 7 Trustee where Defendants repled under the Federal Declaratory Judgment Act.

Attorney Fees, however, there was no discussion as to why these fees were denied. And, the Bank does not elaborate with respect to its use of this case. It is possible that Judge Nowlin denied the fees because the relief requested was pursuant to the Federal Declaratory Judgment Act. We simply do not know.

Federal courts follow the American Rule in the absence of fee-shifting congressional legislation. *See Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). Section 2202 of the Federal DJA provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted . . .against any adverse party whose rights have been determined by such judgment." As the Fifth Circuit has noted, however, §2202 of the Federal DJA "does not by itself provide statutory authority to award attoney's fees that would not otherwise be available under state law in a diversity action." *Mercantile Nat'l Bank v. Bradford Trust Co.,* 850 F.2d 215, 218 (5th Cir. 1988); *In re Calder,* 171 B.R. 36 (Bankr. N.D. Tex. 1994). Furthermore, the "otherwise. . . available state law in a diversity case must be substantive, for *Mercantile* explicitly stated that an award of attorney's fees in a federal declaratory judgment action "is confined to two situations: (i) where under the restrictive American rule, attorney's fees are allowed; and (ii) where *controlling substantive law* permits recovery. " *Mercantile* at 216. (Emphasis added).

Here the Defendants rely on §37.009 of the Texas DJA to authorize recovery of attorney's fees. Although the Texas DJA expressly provides for attorney's fees, it functions solely as a procedural mechanism for resolving substantive "controversies which are already within the jurisdiction of the courts." *Housing Authority v. Valdez,* 841 S.W.2d 860, 864 (Tex. App.–Corpus Christi 1992, writ denied). Unlike substantive law, however, Texas procedure does not govern this

diversity action.    The Fifth Circuit has held on more than one occasion that although "a party may recover fees in a federal declaratory judgment action where 'controlling substantive law' permits such recovery," "the Texas DJA is neither substantive nor controlling." *Utica Lloyd's of Texas v. Mitchell,* 138 F.3d 208 (5th Cir. 1998);  *Self-Insurance Institute of America, Inc. v. Korioth,* 53 F.3d 694 (5th Cir. 1995).

Other parties have argued that it would be unjust to deny attorneys' fees that would have normally been granted under the Texas DJA but for removal of the case to federal court on diversity grounds.  *Citizens Nat'l Bank v. Kirchman Cos.,* 1991 WL 131945, at *6 (N.D. Tex. 1991), which held that removal from state to federal court should not deprive plaintiffs of their right to recover attorneys' fees under §37.009.  That case, however, was decided seven years prior to the Fifth Circuit's holding in *Utica*, which has been cited as explicitly eliminating the distinction between cases originally filed in federal court and removal cases for the purpose of determining awards of attorneys' fees under §37.009.  *SG/IP, Ltd. V. Centers,* 2004 WL 2026810 (N.D.Tex. 2004) *citing Utica,*138 F.3d at 210.

However, *Utica* was not a removal in a bankruptcy proceeding but in a diversity action. Here, the Chapter 7 Trustee removed this state court matter to a federal bankruptcy court.  This Court will therefore apply the Texas DJA distinguishing such matter as one in equity as opposed to a diversity action.  The Texas DJA was, after all, the original basis for relief pled by the Borrowers in state court.  Removal should not result in such a loss if the fees are otherwise appropriate under the Texas DJA.

The Texas Constitution, Article XVI, §50(a)(6)(Q)(x) describes remedies imposed when a lender fails to comply with the requirements for making a valid home equity loan.  However, it does

22

not by its terms enable the borrower to institute a judicial proceeding.  Before a borrower may invoke the remedies prescribed by Article XVI, §50(a)(6)(Q)(x), the borrower must obtain a judicial determination that the home equity loan violates one of the protective provisions of the Home Equity Lending Amendment.  The Texas DJA provides the statutory basis for instituting such a judicial proceeding.  *Tarver v. Sebring Capital Credit Corp.,* 69 S.W.3d 708 (Tex. App.–Waco, 2002, no writ); *Wachovia Bank of Delaware, N.A. v. Gilliam,* 2005 WL 1531293 (Tex. App.-Waco 2005)(rehearing overruled Aug. 23, 2005)(rule 53.7 motion filed Oct. 26, 2005).

Although we find that the Texas DJA is the appropriate statute with which to institute this proceeding, the Bank claims that such declaratory judgment action is not proper when the issues are already before the court as the Bank filed its suit for judicial foreclosure first.  The Texas DJA is not available to settle disputes already pending before a court.  *Adams v. First National Bank,* 154 S.W.3d 859, 873 (Tex. App.–Dallas, 2005, no writ); *BHP Petroleum Co. v Millard,* 800 S.W.2d 838, 841 (Tex. 1990); *John Chezik Buick v. Friendly Chevrolet,* 749 S.W.2d 591, 594 (Tex. App.–Dallas, 1988, writ denied).  In general, declaratory relief will not be granted where the cause of action has fully matured and invokes a present remedy at law.  *Adams,* 154 S.W.3d 859, 873.  A declaratory judgment action is improper if declaratory relief is requested for the first time in an amended petition and merely raises the same issue.  *Id.*  Further, it may not be used solely to obtain attorney's fees that are not authorized by statute.  *Breitenfeld v. SAS Institute, Inc.,* 147 S.W.3d 672 (Tex. App.-Dallas 2004) *review granted, judgment rev'd by 2 SAS Institute, Inc. v. Breitenfeld,* 167 S.W.3d 840 (Tex. July 1, 2005).  If the request for declaratory relief adds nothing to the suit other than a claim for attorney fees, then the request should be denied.

In *John Chezik*, the court found that a declaratory judgment counterclaim was not properly brought, because the issue raised by the defendant (that no agency relationship existed) was already before the court as part of the plaintiff's case. The court distinguished counterclaims seeking a true declaration controlling an ongoing and continuing relationship: "In our current case, *the harm sued upon was a one time occurrence that is fully covered by [the plaintiff's] original suit*." *Id.* at 595 (emphasis added). *See also, Heritage Life v. Heritage Group Holding,* 751 S.W.2d 229 (Tex. App.-Dallas, 1988, writ denied)( dismissal of declaratory judgment counterclaim proper because no new controversies presented).

Here, however, the Borrowers filed a separate suit in state court alleging violations of the home equity statute. That lawsuit was then consolidated with the Bank's initial lawsuit to foreclose its lien. Further, the Borrowers counterclaim for declaratory judgment action presents issues beyond those raised by the Bank. When a declaratory judgment counterclaim has greater ramifications than the original suit, the court may allow the counterclaim i.e. the question here is whether the Borrowers' counterclaim is more than a mere denial of the Bank's cause of action for foreclosure and/or does it state a "cause of action" on which the Borrowers could recover benefits or relief if the Bank abandoned its cause of action or failed to establish it. The Court believes so.

Here, the Bank initially filed suit in state court requesting judicial foreclosure in compliance with the home equity statute. Borrowers filed another suit for violations of the home equity statute and usury. These lawsuits were consolidated in state court and then the suit was removed to Bankruptcy Court. The Bank repled its suit requesting judicial foreclosure and the Borrowers counterclaimed requesting that the Court declare the Bank's lien invalid and that the Bank forfeit all principal and interest as the Bank had violated certain requirements under the home equity

24

statute.   The Borrowers causes of action are independent of the Bank's foreclosure suit.

Therefore, this action for declaratory relief is the appropriate judicial proceeding for obtaining a determination of whether a home equity loan complies with the home equity lending requirement.   The Borrowers are entitled to their reasonable and necessary attorney fees and costs pursuant to Tex. Civ. Prac. & Rem. Code Section 37.009.

The parties stipulated to the reasonable and necessary fees in their pre-trial orders.  As such the fees to be awarded to Borrowers under the Texas DJA are $35,000.00 for trial preparation with costs and expenses of $1,625.00.  Any fees earned on appeal will be as follows: United States District Court –$10,000.00, United States Court of Appeals–$5,000.00, Petition for Certiorari–$2,500.00 and United States Supreme Court–$5,000.00.

The Bank has also violated the usury provisions of the Texas Finance Code in connection with its handling of the Home Equity Loan, and therefore Borrowers claim the Bank is also liable to them for their reasonable attorney fees under this statute:

§305.005 "A creditor who is liable under Section 305.001 is also liable to the obligor[s] for reasonable attorney's fees set by the court."

Tex. Fin. Code Ann. (West Supp. 2004).

The Bank's usury liability under Tex. Fin. Code, Chapter 305, is not less than:

| | |
|---|---|
| §305.001(a) | $605,568.12 |
| §305.002(a) | 779,078.67 |
| | 1,384,646.79 |

In their Trial Brief, the Borrowers claim their reasonable attorneys fees are $553,858.72 [(40%) of $1,384,646.79] .   However, the Borrowers introduced no evidence as to the reasonableness of their attorney fees under the usury statute.  Further, the parties appear to have

25

stipulated to reasonable attorney fees for all purposes in their Pre-Trial Orders.   As such the parties are bound by this agreement, and Borrowers are only entitled to payment of the stipulated fees.   The contingency fee agreements entered into between the Borrowers' attorney and the respective trustees are  merely that– agreements between those parties.  It is not evidence of the reasonableness of fees for purposes of this suit.

Conclusion

Based on the home equity violations discussed above, the Bank must forfeit all principal and interest owed or paid by the Borrowers under the Home Equity Loan.  This means the Bank must repay the interest paid by the Borrowers in the amount of $ 95,227.20.

The Bank also required as a condition to making the Home Equity Loan, that the Borrowers pay a portion of the third party debt of TFC and such payment must be included for purposes of the interest calculation on the Home Equity Loan.  As such, the Bank charged and received interest in excess of the lawful rate as well as in excess of double the maximum amount of lawful interest.  The Bank must pay the Borrowers $605,568.12 pursuant to Tex. Fin. Code §305.001(a) and $779,078.67 pursuant to Tex. Fin. Code §305.002 (a) for a total amount of $1,384,646.79.

The Borrowers, for purposes of both the Texas DJA and the Texas Finance Code, are awarded their reasonable and necessary attorney fees as stipulated in the amount of $ 35,000.00 and costs in the amount of $1,625.00 incurred in this case in addition to fees earned on appeal  as follows: United States District Court–$10,000.00, United States Court of Appeals–$5,000.00, Petition for Certiorari-$2,500.00 and United States Supreme Court-$5,000.00.

###

Copies to:

James D. Jameson
4807 Spicewood Springs Road
Building 2, Ste. 420
Austin, Texas 78759


Brian Turner
Heard, Robins, Cloud
Lubel & Greenwood, L.L.P.
210 Barton Springs Road, Ste. 550
Austin, Texas 78704